## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| KIEWIT INFRASTRUCTURE SOUTH CO., | ) ) ) |
| *Plaintiff,* | ) ) CASE NO.: |
| v. | ) ) JUDGE: |
| AECOM TECHNICAL SERVICES, INC., | ) ) ) |
| *Defendant.* | ) ) |
| _____ | ) |

## COMPLAINT

Plaintiff Kiewit Infrastructure South Co. ("KISC" or "Plaintiff"), states its claims in this Complaint against Defendant AECOM Technical Services, Inc. ("AECOM" or "Defendant"), as follows:

### Parties

1.      At all times material hereto, KISC was a Delaware corporation registered to do business in the State of Florida with its principal place of business at 1550 Mike Fahey St., Omaha, Nebraska 68102.

2.      Upon information and belief, and at all time material hereto, AECOM was a California corporation registered to do business in the State of Florida with its

principal place of business at 300 South Grand Avenue, 9th floor, Los Angeles, California 90071.

## Jurisdiction and Venue

3.　This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

4.　Plaintiff is a citizen of Nebraska and Delaware. Defendant is a citizen of California. There exists complete diversity of citizenship among Plaintiff and Defendant.

5.　The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.　The Project and many of the actions, errors and omissions associated with the Project are located or occurred in this judicial district.

7.　Venue properly lies in this forum pursuant to 28 U.S.C. § 1391(b) because many of the events that gave and continue to give rise to this Complaint occurred in this judicial district.

## Relevant Facts

### Project Background

8.　On or about January 20, 2017, the Tampa Hillsborough Expressway Authority ("THEA" or "Owner") released a draft Design-Build Request for Proposal ("RFP") to solicit competitive bids for the Selmon West Extension, an elevated

viaduct over the existing Gandy Boulevard, from the Gandy Bridge to the western terminus of the Selmon Expressway in Hillsborough County, Florida (the "Project" or "Selmon West Extension"). The Project includes a 1.9-mile toll lane, located in the median of Gandy Boulevard, which will allow travelers to use Gandy Boulevard for local destinations, or the Selmon West Extension for a direct connection to the Selmon Expressway or the Gandy Bridge.

9.     THEA required potential bidders to submit an Extended Letter of Interest ("ELOI") that THEA used for the purpose of short-listing and differentiating design-build teams. KISC submitted its ELOI on February 10, 2017.

10.     To assist bidders in formulating their bids, the RFP contained detailed design and build requirements for the construction of the Selmon West Extension.

11.     The RFP required all interested bidders to submit a Bid Proposal, consisting of a separate Technical Proposal and Price Proposal.

12.     Under the RFP, the Technical Proposal was to include preliminary design plans, preliminary specifications and special requirements, technical reports, calculations, a proposed Contract Time along with schedules, and certain other data requested in response to the RFP.

13.     The Price Proposal was to include one lump sum price for all design, geotechnical surveys, and construction of the proposed project, preliminary design submittal reports, services, and all other data requested in response to the RFP.

14. In response to the RFP, KISC began preparations to submit a Bid Proposal to THEA for the Project.

15. KISC entered into a Memorandum of Understanding ("MOU") with AECOM dated October 10, 2016, under which KISC teamed up with AECOM to prepare and submit KISC's Bid Proposal to THEA.

16. Under the MOU, AECOM was responsible for preparing the design of the Project. The MOU emphasized the importance of AECOM's design, as it was the basis of the Price Proposal that KISC would submit to THEA and be bound to if awarded the Project.

17. The MOU provided that AECOM would be KISC's "lead designer for the Project," and that KISC and AECOM would "maintain an exclusive teaming relationship for the Project during the pre-award phase and, if awarded the Project, during the design-build phase pursuant to a design subcontract."

18. As the lead designer and engineer of record on the Project, AECOM was obligated under the MOU to review the RFP and contract documents and develop a design ("Proposal Design") upon which KISC would rely in order to submit an accurate, high quality, lump sum Price Proposal to THEA.

19. AECOM was intimately involved during the nine-month proposal process, including preparation of the ELOI and the Technical Proposal. AECOM

invoiced KISC – and KISC paid – approximately $850,000 in professional engineering fees during the proposal phase.

20.     KISC relied on AECOM's Proposal Design and submitted its Technical Proposal on June 21, 2017, followed by its Price Proposal on or before the bid deadline of August 7, 2017.

21.     In its Price Proposal, KISC committed to complete the design and construction of the Project for a lump sum price of $230,058,000. This lump sum price was based on AECOM's Proposal Design.

22.     THEA awarded the Design-Build Contract for the Project to KISC.

23.     On August 9, 2017, KISC entered into a Subcontract for Design ("Subcontract") with AECOM for a lump sum of $15,092,186.

24.     Pursuant to the Subcontract, AECOM agreed to perform the "Design Services," which include the duty to "timely furnish all professional, technical and supervisory personnel, services, equipment, materials and supplies necessary to prepare and to provide the design concept, the design, and the plans and specifications, including all related work, necessary to enable Contractor to perform the construction specified in the Prime Contract."

25.     The Subcontract provisions make explicitly clear the importance of the accuracy and adequacy of AECOM's Proposal Design, and the substantial financial

impacts KISC would incur if AECOM's final design deviated significantly from its Proposal Design (also referred to as "Basis of Design").

26.    The Subcontract imposes a duty on AECOM to avoid significant deviations from its Proposal Design in the development of its final design.  AECOM expressly agreed to be financially responsible for deviations from the Proposal Design to the final design that rise to the level of "significant." KISC undertook the risk for AECOM's deviations that were not "significant."

27.    Importantly, this contractual allocation of financial responsibility in the Subcontract is separate and distinct from AECOM's potential liability for breaches of the Standard of Care.

28.    The Subcontract states that the Standard of Care, with which AECOM is obligated to comply for all Design Services performed under the Subcontract, shall be the care and skill ordinarily used by members of the design profession who are practicing under similar conditions at the same time and in the same locality.

29.    In order to fulfill its obligations under the Subcontract, AECOM entered a Design-Build Consulting Services Subcontract with Professional Service Industries, Inc. ("PSI") for geotechnical design and build services on or about August 23, 2017.  The Design-Build Consulting Services Subcontract between AECOM and PSI ("PSI Subcontract") incorporated the Subcontract between AECOM and KISC and included a similar Standard of Care.

30.     KISC and THEA executed the Design-Build Contract on September 7, 2017, and THEA gave KISC the Notice to Proceed on September 25, 2017.

MSE Wall Ground Improvements

31.     AECOM's Proposal Design for the Project included mechanically stabilized earth ("MSE") walls for certain ramps that would allow traffic to enter and exit the Selmon West Expressway.

32.     KISC relied upon AECOM's MSE wall designs in preparing its Price Proposal for the Project.

33.     Prior to the award of the Design-Build Contract, AECOM's proposed design called for full-height surcharge, or soil embankments, and, in some areas, geogrid fabric to mitigate the geotechnical challenges involved with constructing Ramp F (Wall 2) and Ramp A (Walls 5 and 6).  AECOM's proposed design further indicated that no ground improvements would be required at Ramp D.

34.     On July 25, 2017, AECOM summarized its recommendations for the MSE walls in its Preliminary MSE Wall Design Memorandum, which became the basis of KISC's Price Proposal to THEA.

35.     Prior to the award of the Design-Build Contract, AECOM had access to all of the RFP Geotechnical Reports that were provided by THEA.

36.     After the award of the Design-Build Contract on September 7, 2017, and throughout January 2018, KISC continued to rely upon AECOM's pre-award

7

recommendations of surcharge/geogrid for the MSE walls. At that time, AECOM had not given KISC any indication that its pre-award recommendations of surcharge for the MSE walls would not work.

37.    By late January 2018, however, AECOM's and PSI's pre-award recommendations for the MSE walls started to change. On January 22, 2018, PSI provided a "Ramp F Slope Stability Update" indicating that the "geometry for the walls along Ramp F has been updated from the geometry was analyzed during RFP."

38.    Subsequently, on January 24, 2018, PSI emailed its slope stability analyses for Ramp F that showed, for the first time, that a change in its pre-award design was necessary and Ramp F would require a combination of pile and geogrid solutions.

39.    By including piles in its analyses for the first time, AECOM and PSI indicated that the pre-award recommendations for geogrid/surcharge would not work without costly additional measures, including piles, to address the stability of the various ramps.

40.    In February 2018, AECOM and PSI recommended comprehensive design changes including piles for the MSE walls, while KISC attempted to mitigate the changes through solutions that conformed to the Price Proposal, which it developed based on AECOM's pre-award recommendations of surcharge and geogrid.

41.   In March 2018, PSI admitted that surcharge would not work ("surcharge will not produce the desired settlement results") at Ramp F and identified global stability issues with other walls.

42.   In late March 2018, KISC, AECOM, and PSI held a Geotechnical Workshop to attempt to resolve the problems with AECOM and PSI's design.  At the Geotechnical Workshop, AECOM instructed KISC to utilize precast concrete piles because FDOT had previously approved precast piles on other AECOM projects in Florida.

43.   On April 6, 2018, KISC notified THEA about the issues with the MSE walls, explaining that some of the MSE walls would require additional ground improvements.

44.   Following AECOM's recommendation to utilize the pile design FDOT had previously approved on other AECOM projects, the parties worked to finalize the MSE wall designs in April 2018. At this point, it was critical that the MSE wall designs were completed and accurate, and then submitted to THEA for approval.

45.   On May 9, 2018, KISC submitted the "Ground Improvement Calculations 90% Submittal" to THEA. KISC was not originally required to submit any ground improvementpackages to THEA because the pre-award design for the MSE walls from AECOM only called for surcharge.

46.    Nearly four months later, on August 23, 2018, THEA issued the Released for Construction ("RFC") Ground Improvement Construction Package. The RFC design, which was professionally stamped by AECOM and PSI, included precast concrete piles and a geogrid load transfer platform.

47.    Among other things, the RFC design required KISC to construct column-supported embankments consisting of 1,300 concrete piles with cast-in-place caps and a load transfer platform. These additional measures caused the cost of constructing the Project to grossly exceed KISC's planned cost. In addition, AECOM's breaches in its design of the MSE walls caused delay and disruption to other aspects of KISC's work.

48.    Due to AECOM's breaches of the Subcontract and breaches of the Standard of Care in its design of the MSE walls, KISC incurred at least $11.4 million of increased direct costs for which it is entitled to recovery, in addition to delay and disruption costs resulting from AECOM's breaches.

<u>Drilled Shafts</u>

49.    As prescribed in the RFP, the Viaduct for the Project consists of a single cell segmental box girder supported by single columns and caps founded in the median. However, as part of the ELOI process, KISC developed (and THEA approved) an Alternative Technical Concept ("ATC") for a prototype, extradosed

10

fin superstructure, which allowed span-by-span erection methods for longer spans not typically possible with this method of erection.

50.     The precast segmental, extradosed fin viaduct concept significantly reduced quantities and schedule duration over the typical balanced cantilever construction methods that were anticipated for the Project.

51.     The viaduct consists of 35 spans and 8 unique units consisting of 4 or 5 spans each, separated by expansion piers. THEA prescribed the span lengths, configurations and pier geometry in the RFP.

52.     The structural demands in the 4 - 42" diameter drilled shafts that support each pier are directly proportional to the loading (structure proportions and design criteria) and the eccentric geometry of the drilled shaft group relative to the centerline of the bridge dictated by the median (footing offset).

53.     As the designer for this Project, AECOM was aware that it was solely responsible for the development of a compliant design and accurate quantities for pricing. Indeed, KISC directly asked AECOM whether it would be willing to develop KISC's concept and assume responsibility for the bid design, and AECOM agreed to do so. AECOM developed its own structural models, design calculations, drawings and quantities for KISC's use in preparing its Price Proposal.

54.     The design of the Viaduct had several unique features that AECOM was responsible for taking into consideration: location in the median of a major

arterial highway that required the support columns to be offset transversely from the center of gravity of the superstructure; limited space for constructing the drilled shafts and caps next to active traffic lanes, requiring the center of gravity of the shafts to be offset transversely from the center of gravity of the superstructure; a curving alignment that produced three-dimensional effects in the Viaduct; and associated large transverse moments in the columns and pile groups, etc.

55.    On June 19, 2017, AECOM completed the proposed design it developed for pricing and inclusion in KISC's Technical Proposal. KISC relied upon AECOM's proposed design in submitting its lump sum Price Proposal to THEA.

56.    On August 9, 2017, AECOM began its post-award design for the viaduct. As the foundation design progressed, the demands to the drilled shafts (and therefore the quantities) progressively increased as AECOM (1) continuously expanded the design criteria and made them more onerous; (2) increased the foundation offset at the majority of piers; and (3) eventually recognized the full complexity of structural behavior and captured it with 3-dimensional modeling of every span.

57.    AECOM's pre-award design did not include or account for the frictional loading criteria for expansion bearings that was required in the RFP; wind loading criteria for the Viaduct; the requirement to design for a 5% increase in loads; and the requirement to discount the outer four inches of concrete.

58.     Further, AECOM's pre-award design did not consider the geometry and general arrangement of the Viaduct, including: the three-dimensional nature of the loading from opposing cantilever piers; the magnitude of the foundation offset required to clear the roadway below; the number of fixed piers required in continuous units; and the fact that the continuous units all had more than three spans.

59.     There were significant changes between AECOM's Proposal Design and RFC designs, including changes in shaft loads and lengths, changes in the drag coefficients for the box girder and fin for wind loading, change in offset as a deviation, the redundancy factor required for cantilever piers, and the omission of cover concrete in the drilled shaft capacity.

60.     Despite the fact that AECOM had all of the information required to determine accurate drilled shaft demands and quantities pre-award, in AECOM's post-award RFC designs, the average drilled shaft demands increased by more than 25% (from 1100 tons to 1400 tons), and the highest loaded shaft demands increased 53% (from 1100 tons to 1685 tons) more than the estimate values AECOM provided for KISC's use in the Price Proposal.

61.     AECOM was responsible for determining the correct shaft loads and lengths for KISC to use in its Price Proposal. The Subcontract requires AECOM to avoid making significant changes to the Proposal Design (or be responsible for all increased costs resulting from the same).

62.    AECOM's changes to the design of the drilled shafts can only be described as substantial deviations, which caused KISC to incur substantial additional costs. There were significant changes in shaft loads and lengths between AECOM's Proposal Design and RFC designs, in breach of the Subcontract. In addition, AECOM's breaches in its design of the drilled shafts caused delay and disruption to other aspects of KISC's work.

63.    Due to AECOM's breaches of the Subcontract and breaches of the Standard of Care in its design of the drilled shafts, KISC incurred at least $7.5 million of increased direct costs for which it is entitled to recovery, in addition to delay and disruption costs resulting from AECOM's breaches.

<u>Bridge Bearings</u>

64.    AECOM had the duty to adequately evaluate the bridge loads to determine accurate and realistic bearing tables.

65.    AECOM's scope of responsibility included an obligation to appropriately determine the loads imposed by the bridge to the bearings during erection and for the final design.

66.    During the proposal phase, AECOM provided bridge bearing schedules for the Viaduct as a deliverable for the Technical Proposal submittal. KISC provided these schedules to its supplier, R.J. Watson, and in turn, R.J. Watson provided its pricing to KISC for inclusion in the Price Proposal to THEA.

67.    During the proposal phase, THEA issued a Pre-Bid Q&A dated July 27, 2017. In a question pertaining to bearing loads, AECOM responded that "…subject to review and approval of the Authority, in the final design AECOM will adopt a sufficiently conservative approach to determine the load distribution to each bearing in order to adequately size the bearings and sufficiently design and detail the pier segment."

68.    After the pre-bid Q&A session on July 27, 2017, and up to the Price Proposal deadline of August 7, 2017, AECOM made no changes to the bearing loads to account for these concerns. As such, AECOM did not tell KISC to increase the size of the bearings and carry additional cost in its Price Proposal to account for the concerns THEA raised during the Q&A session.

69.    After THEA awarded the Prime Contract to KISC, AECOM developed the RFC drawings, which included bearing tables. AECOM's post-award design development revealed three significant errors in its Basis of Design that KISC had relied upon for its lump sum Price Proposal to THEA:  (1) AECOM's design approach did not account for the dead load and live load torsion on the viaduct; (2) AECOM's pre-bid calculations failed to account for FDOT requirements to increase the bearing capacity by 5% for C Piers; and (3) AECOM's Proposal Design calculations did not account for sufficiently conservative or comprehensive values in the bearing loads pre-bid.

15

70.     Once KISC accounted for these deficiencies in AECOM's design, the bridge bearing requirements changed dramatically, resulting in substantial additional costs. AECOM had to change its post-award drawings to contain significantly larger bearings with higher loads, as well as more guided and multi directional bearings than in the pre-bid bearing tables (a significant deviation of 104% by weight).

71.     Specifically, from the Proposal Design to the RFC design:

- Bearing loads (strength limit state) increased 23% overall;

- Overall bearing steel weight more than doubled, from 180,000 lbs. to 367,000 lbs;

- 34 multi-directional bearings changed from MD (lowest cost) to FX or UD (higher cost);

- 97 anchors added;

- Bearings required additional details, e.g., steel guide bars, welding, stainless steel, and Teflon materials;

- Additional labor and equipment required to install bearings twice as large; and

- Design and shop drawing issues required additional oversight.

72.     In addition, AECOM's breaches in its design of the bridge bearings caused delay and disruption to other aspects of KISC's work.

73.     AECOM's breaches of the Subcontract and of the Standard of Care in its design of the bridge bearings caused KISC to incur at least $1.5 million of increased direct costs for which it is entitled to recovery, in addition to delay and disruption costs resulting from AECOM's breaches.

## COUNT I
## Breach of Contract

74.     The preceding allegations of this Complaint are hereby re-alleged and incorporated herein.

75.     On or about August 9, 2017, KISC and AECOM entered into the Subcontract, whereby AECOM agreed to perform Design Services, including the duty to "timely furnish all professional, technical and supervisory personnel, services, equipment, materials and supplies necessary to prepare and to provide the design concept, the design, and the plans and specifications, including all related work, necessary to enable [KISC] to perform the construction specified in the [Design-Build] Contract."

76.     AECOM's obligations under the Subcontract included its development of the Proposal Design and the final design, which was not to deviate significantly from the Proposal Design.

77.     KISC has fulfilled all of its material obligations and complied with all conditions precedent under the Subcontract. Any obligations not performed or conditions precedent not complied with have been waived, excused, or made impossible by AECOM.

78.     AECOM materially breached the Subcontract by, among other things:

   a. Providing a fundamentally flawed Proposal Design for the Project's MSE walls;

b. Failing to recognize and address appropriate ground improvement measures for the MSE walls in the Proposal Design;

c. Failing to consider RFP design criteria and the unique features of the Viaduct design that required explicit considerations;

d. Failing to coordinate the roadway design, traffic control plan, and construction sequence with the structural design of the shafts and footings to ensure that the detrimental footing offset was reflected in the estimate shaft demands;

e. Failing to consider in the Proposal Design the known complexity and uniqueness of the alignment, the span configurations, and cantilever pier orientations (all provided by THEA) when making the judgment to extrapolate the results from one shaft in a limited model to all 144 shafts in the viaduct;

f. Failing to account for the dead load and live load torsion on the viaduct;

g. Failing to account for FDOT requirements to increase the bearing capacity by 5% for C Piers; and

h. Failing to account for sufficiently conservative or comprehensive values in the bearing loads pre-bid.

79.    AECOM's breaches of the Subcontract resulted in significant changes, or substantial deviations, between AECOM's Proposal Design and RFC designs, which caused KISC to incur substantial additional costs.

80.    As a direct result of AECOM's material breaches of the Subcontract, KISC has been significantly damaged in the amount of at least $20.5 million of increased direct costs, in addition to delay and disruption costs.

WHEREFORE, KISC demands judgment against AECOM in the amount of at least $20.5 million in increased direct costs, in addition to delay and disruption costs, resulting from AECOM's breaches of the Subcontract, plus interest, attorneys'

fees, and costs, and such other relief at law, in equity or otherwise as may be just and proper.

## COUNT II
## Professional Negligence

81.     The preceding allegations of this Complaint are hereby re-alleged and incorporated herein.

82.     AECOM owed KISC a duty of care and was obligated to perform the Design Services in accordance with the standard of care, both under the terms of the Subcontract and as required by Florida law, including, but not limited to, the obligation to execute the level of care and skill ordinarily used by members of the design profession who are practicing under similar conditions at the same time and in the same locality.

83.     The responsibility for both the pre-bid design and post-award design rests solely with the engineer of record, AECOM.

84.     As set forth above, AECOM failed to exercise reasonable care in fulfilling that duty and failed to adhere to the standard of care with regard to the MSE walls, drilled shafts and bridge bearings. The standard of care provided by AECOM was insufficient, and not the care and skill ordinarily used by members of the design profession who practice under similar conditions.

85.     AECOM's breaches of its standard of care directly and proximately caused KISC to incur substantial damages.

WHEREFORE, KISC demands judgment against AECOM in the amount of at least $20.5 million in increased direct costs, in addition to delay and disruption costs, resulting from AECOM's professional negligence and breaches of the standard of care, plus interest, attorneys' fees, and costs, and such other relief at law, in equity or otherwise as may be just and proper.

## **Relief Requested**

KISC respectfully requests a trial of its claims and that the Court enter an Order granting the following relief:

(a) Requiring AECOM to pay KISC at least $20.5 million in increased direct costs resulting from  AECOM's breaches of the Subcontract and its Professional Negligence;

(b) Requiring AECOM to pay KISC an amount to be determined at trial for the delay and disruption costs incurred by KISC as a result of AECOM's breaches of the Subcontract and its Professional Negligence;

(c) Requiring AECOM to reimburse KISC for its reasonable attorneys' fees, costs and expenses, plus applicable interest.

(d) Granting further legal and equitable relief as this Court deems just and proper.

Respectfully submitted this 31st day of August 2021,

> *s/R. Craig Mayfield*
> R. Craig Mayfield
> Florida Bar Number No. 0429643
> cmayfield@bradley.com
> **Bradley Arant Boult Cummings LLP**
> 100 North Tampa Street, Suite 2200
> Tampa, Florida 33602
> Telephone: (813) 559-5500
> Facsimile: (813) 229-5946
>
> -and-
>
> James F. Archibald III (*pro hac vice* motion
> forthcoming)
> jarchibald@bradley.com
> Carlyn E. Miller (*pro hac vice* motion
> forthcoming)
> camiller@bradley.com
> **Bradley Arant Boult Cummings LLP**
> One Federal Place
> 1819 Fifth Avenue North
> Birmingham, Alabama 35203-2119
> Telephone: (205) 521-8000
> Facsimile: (205) 521-8800
>
> *Attorneys for Plaintiff*

## DEFENDANT TO BE SERVED BY PROCESS SERVER AT:

AECOM Technical Services, Inc.
c/o C T Corporation System
1200 South Pine Island Road
Plantation, FL 33324